First case for argument today is 18-1790 Spitz Technologies v. Nobel Biocare. Ms. Sullivan, good morning. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan for Appellant Spitz Technologies Corporation. The 227 patent is a patent on a novel device for a self-drilling and self-tapping dental implant. That is, one that can be inserted all in a single step without successive rounds of drilling into the jawbone. And the accused Nobel implant practices the key claims at issue here, but the District Court granted summary judgment of non-infringement based on a claim construction of two limitations that we contend was erroneous and that you should reverse on de novo review. Now to focus on the key error in the claim construction, let me remind you that the limitations we're concerned with here are all about the tip of the implant, the very bottom of the implant. But the claim term we're dealing with is the generally longitudinal access, which is what runs through the entire device, right? That's correct, Your Honor. That's exactly correct, Your Honor. And I guess my concern with your argument, just to get to it, is that when you look at the figures, figure one, figure two, what they show as being this generally longitudinal access seems to align perfectly, in my mind, with how the Court construed it and not how you're proposing to construe it. So tell me why I'm wrong. Your Honor, with all due respect, that is wrong, and I'd like to focus on figure two, because after all, the patent tells us that the tip portion is most clearly shown in figure two. Now if we look at figure two, it's in the appendix at 54, and I think it's worth spending a little time with figure two if you don't mind me walking you through it. So figure two shows that the cutting edges in figure two, the cutting edges are numbered 42 and 52, 42 and 52. Figure two makes clear that they cannot meet at the midpoint or the imaginary line at the center, and here's why. We know that the cutting edges, 42 and 52, must be adjacent to the flutes. Now the flutes are the hollow... Not necessarily entirely. Yes, entirely, Your Honor, and here's why. Because we know that the flutes are the hollow passageway for evacuating the bone ships while the drilling occurs. And we know from the specification, it goes into great detail, and I commend Your Honors to look at the patent at appendix 56 at columns three and four. In particular, I won't go through it all now, but columns three and four at lines three, sorry, column three lines 21 to 29, and column three lines 21 to 29, and column three lines 42 to 49, make very clear that when you cut, you must evacuate the bone ships. And in fact, column three tells us at lines 42 to 49, it's very important to evacuate the bone ships through the flute as you cut, because otherwise you could cause tissue damage, nerve damage, and bone damage. And in fact, the patent specification tells us it's not like drilling a screw into wood where you can compress the wood to the side. You'll damage the bone if you do that, so you've got to evacuate the bone ships as you drill. And that's why, Your Honor, adjacency must be complete. It cannot be partial. The word partial does not appear. The crucial language about adjacency, and I commend this to Your Honor, is in the first paragraph of column three, the first full paragraph of column three. And there's an extremely crucial sentence there, and this is worth reading in its entirety. This says that the first cutting blade, I'm in column three, fourth line, the first cutting blade 40 has a cutting edge 42, while the second cutting blade 50 has a cutting edge 52. One end of the first flute, portion 26, is adjacent to the cutting edge 42 of the first cutting blade 40, while one end of the second flute, portion 28, is located adjacent to the cutting edge 52 of the second cutting blade. Now, Your Honor, let's go back to the diagram, and now we see why the cutting edges, 42 and 52, cannot possibly meet at the midpoint. We go back to figure... What does figure one show? Well, figure one shows the imaginary line at 16 drawn as a dotted line, so that's not part of the structure. But it also shows cutting edge 42 and cutting edge 52, which seem to meet at the very bottom point of the device. Well, actually they don't, Your Honor, because if you look at the very bottom of figure one on page 53, and if you look at the tiny triangle on the flute side, the flute is depicted in cutaway only on the left. There's a tiny triangle at the very bottom of the tip, and that is a reminder that the flute does not go all the way down to the tip. Well, what is that structure that's shown at the very point? Well, our position is that the flute does not go down to the very point. But there is a structure there. Correct. There is depicted a structure in figure one, but when we go to figure two, and figure two tells us that it is the one that shows us most clearly, it shows very clearly in figure two that little triangle I was pointing out to you, Your Honor. And the key is if you look at the flutes, the curve of the flutes, which are demarcated as 26 and 28, if you look at the curves, the curves don't meet in the middle. But there is a line, there's a horizontal, I'm sorry, vertical line. Yes, Your Honor, and I know... Goes completely from the top to the bottom, and there's nothing to suggest or indicate where 42 and 52 meet. Your Honor, that's, well, they don't meet, and that's the key. And let me, the vertical line, I think, has to be regarded in light of the text of the specification. It has to be regarded as a Draftsman error or an inkblot, because the text of the specification could not be clearer, that the cutting edge must be adjacent to the flute. Can I ask you, I have a hard time following these diagrams and your description of it, but looking at figure two, is your point that that up and down line that goes all the way through, the portion in the middle that corresponds to those two rounded edges doesn't actually exist? Yes. The cutting edge goes only up to where the curve goes on both sides, and then there, even though that line is drawn through the middle on this diagram, it's not really there? That's exactly right, Your Honor. Just to clarify that, just because it helped me, I had the same question. You have a diagram or another, your version of figure two at page three of blue, and there you show what you think it is, right? That's right, Your Honor. So it's this big cylinder that keeps the lines apart, right? That's right, Your Honor. And if you wouldn't mind looking at Blue Brief 28, Blue Brief 28 is where we have our annotation of figure two that I just walked you through. And my Remember the cutting blades, 40 and 50, are metal, and the flutes, 26 and 28, if we're looking up at them, are hollow. So the way to think about the cutting edge is the cutting edge is just the intersection of the hollow flute with the solid cutting blade. That's all the cutting edge is. I hear your argument, but you're ignoring that straight line in figure two that joins 42 and 52. You're also ignoring the point at the very bottom of the device shown in figure one, and also ignoring the fact that if you're correct that there is no cutting structure at the very center, then the device wouldn't remove any bone chips. It would not function properly. Your Honor, quite the opposite. In order to function properly, there's got to be some non-infinitesimal width between the flutes and between the cutting edges. There must be. Otherwise, the flutes would collapse into one another, and they wouldn't evacuate any bone. So in real life, you can't draw a drill bit, a tip, with infinitesimal line or no space between the two flutes and the two cutting edges. It would collapse. It wouldn't do any work at all. So, Your Honor, I think the best way to think about Can you explain that? I don't understand that. Because in figure two, even if the blade goes all the way through, there's still space between the flutes themselves. They're a different structure. But the metal could go all the way through on the cutting blades. Why isn't that true? Because, Your Honor, as column three teaches in great detail, along with column four, the Dr. Carmichael's invention was to evacuate the bone chips as you plane. If you imagine the cutting edge on the bottom is sort of shaving off bone chips, and they've got to go out into the flute right away. First they pop out the top, and then eventually they pack the flute so that the bone can later integrate with the jaw. And they wouldn't be able to go anywhere if you had a cutting edge that was not adjacent to the flute. So, Your Honor, I think there's a couple of very important absences from figure two. So if that line went all the way through, the cutting edges that are adjacent to the flute might push bone up through the flute, but the bone there in the middle couldn't get to a flute? That's exactly right, Your Honor. A hundred percent right. So the way to think about the tip. Remember in figure one, the tip is not numbered. What Judge Lynn identified as a kind of depicted pointy structure, that's not numbered, and we're not told what sort of apical configuration it needs to have. In real life, to make our implant, you would have to have a slightly nubby or flattened surface there because you want the cutting blades. Remember, nothing here cuts with a point. It cuts with a rotational shaver. If you think about it, the rotational shaver, if I put it on my fingernail, it would start shaving the top of my fingernail off. It's not like a screw that goes down. It's not a jackhammer. It's a rotational plane. If that's the case, and we agree with you that there's no line in the middle, there's no cutting blade in this middle in figure two, then what's doing the work of shaving the bone in the absolute middle of the tooth? Because if that's the case, I don't see how there would be any blade whatsoever that would cut out the middle of the tooth if you're shaving around. Right. I'm sorry for being so inarticulate. This is very difficult for me to describe, but it seems like you're saying the blades only go up here, and so if they're going around shaving like this, what's shaving the very middle of the tooth? The repeated sweep action of the cutting edges. The cutting edges are sweeping, and as there's downward motion, there's downward motion plus sweeping, the tooth hole is being evacuated entirely. It wouldn't be evacuated unless there's a cutting edge of some sort. That's right, Your Honor. And the cutting edge here is adjacent, must be fully adjacent to the flute given the other specifications. What I'm asking you to do is not put too much emphasis on the drawing. I'm invoking your classic law that says look to the text of the specification, don't let the draftsman's error override the text. And the text tells you that adjacency to the flute is key. Your Honor, if you were right... But even if we go with the drawing you suggested, I forget which page on your brief. In page 28 in the blue brief, Your Honor. Yeah. I'm still a little confused about how... So you think that there's no cutting blade in that inner... Is it just the inner green circle or the green circle and the blue circle? Your Honor, I want to be sure I reserve three minutes for rebuttal, so may I answer that? No, please. Okay. Your Honor, our position is that the axis is the blue circle, and we know that the axis must be the blue circle because the axis... No, no, no. I don't want to waste your time. That's not really what I'm asking. Sorry. You want to know how does the green circle cut bone? The green circle or the blue circle. How far up does the cutting blade go? Does it go into the blue circle? The cutting edge begins at the blue circle, and it ends at the outer edge of the cutting blade. So if there's no cutting blade in the blue circle, how does the bone that corresponds to that blue circle going down get shaved off? Well, the same way the Nobel implant works. If you look at the drawing of the Nobel implant, so we look at Nobel's own drawing on page 43, it appears many places, but it too has cutting edges that sweep rotationally. Well, then tell me how it works. Don't just compare it to theirs. I don't understand because you say that the flute is where it gets evacuated. That's right. But then how does that middle get evacuated through the flute  So through downward pressure. So that the flute evacuates the bone chips that are shaved through the rotational action of the cutting edges, and the downward pressure affects the amount of compression that can be tolerated by the bone. But you don't want to have everything compressed. You want to have most of it swept away. And so what this does is it enables you to compress minimally at the center and shave away through the rotation of the blades. And it's the same exact way the Nobel active works. Theirs wouldn't work either if you were correct, Your Honor, because the way they're configured is rotational shaving as well. I have a number of other issues to cover. I mean, I'll give you a couple more minutes if you want to touch on, I don't know, it's your choice, DOE or Briefly on DOE, Your Honor, even if you disagree, we think the claim construction is clearly erroneous because it reads figure two out of the claim, and you should reverse on that basis alone. That takes care of everything else in the case, and the case after this, too, because it would reverse the attorney's fees. If you disagree with us, though, on claim construction, which we hope you don't, you should still reverse the grant of summary judgment of non-infringement because we were denied our DOE, our opportunity to argue DOE, through a legally erroneous prosecution history estoppel finding by the court. And in a nutshell, Your Honor, the court found that prosecution history showed a narrowing amendment that overcame the accused equivalent, the Nobel implant. It did not, Your Honor. We made a 2004 amendment to overcome Clardy. We made a 2005 amendment to overcome Day. Even if we construe both as narrowing, even though we think Day was just clarifying, they had nothing to do with the art in the accused equivalent. We distinguish Clardy and Day were self-tapping, not self-drilling. They had the threads to hold the implant onto the grooves in the side, but they didn't have cutting edges on the bottom. And our distinction, our amendment to distinguish Clardy and Day, made clear that we were a self-tapping and self-drilling implant that had cutting edges at the bottom. So we distinguished their implants, which only had cutting edges along the side that were longitudinal or axial, parallel to the axis. That's how we distinguished Clardy and Day. We said you don't have cutting edges at the bottom. We have radially extending outwardly from the axis, cutting edges at the bottom. So it was a clear violation, Your Honor, of your settled law that a narrowing amendment will not surrender claim scope vis-à-vis an accused equivalent unless the narrowing amendment covered the technology in the accused equivalent. And Clardy and Day, forgive the line, but they were night and day different from the Nobel accused. So, Your Honor, we think we should at least go back on DOE if you don't agree, but we think the claim construction figure two makes clear we should win on that. Thank you, Your Honor. Thank you. May it please the Court, Sheila Seward for Nobel BioCare. The ruling of non-infringement by the district court below was based on the absence of two structural limitations that were missing from the accused Nobel dental implant. One was the lack of a cutting edge extending radially outwardly from the implant's generally longitudinal axis. And it's our position that that construction and that limitation does not depend upon the axis construction that's being disputed here. The second was the lack... So that would be an alternative ground for affirming? That's correct, Your Honor. You don't need that. Go ahead. Yes, the district court found no infringement of both the extending radially outwardly limitation, no literal, no DOE, and then separately found no infringement of the... And then there was no separate claim construction on that first term? That's correct, Your Honor. No one sought construction, and the district court applied the plain and ordinary meaning of that term, which was not disputed on this appeal. Well, since Ms. Sullivan didn't reach that issue, why don't we focus on the discussion we had with your friend... Sure. ...about the term generally longitudinal axis? So we talked a lot about the figures, and there was an argument that we heard today that somehow the cutting edges must begin where the flute is because of an evacuation issue. But there was no testimony, and there's no evidence in the record below that if the cutting edges meet at the longitudinal axis 16 that there wouldn't be able to be evacuation. Well, Ms. Sullivan directed us towards column 3 and 4 of the patent. We don't need testimony if we've got something in the intrinsic record... Certainly, and those... ...that does that. So what do you say to her references to the specification? Sure. Well, the specification explains that the cutting edges 42 and 52 extend from the axis 16. They also explain that the cutting edges cut bone to form a bore. And as Your Honors pointed out in the questioning, if this is truly a self-drilling implant that can be placed into bone without the need for any drilling or any instrument, then why would there be a V-shaped nonfunctional part of the implant just sort of hanging out there and doing nothing? The figure 1 and figure 2 show that there's a V-shaped part of the cutting edges 42 and 52 that meet at the longitudinal axis 16. On figure 1 at the bottom, I think Ms. Sullivan pointed to it, there's this little thing at the very tip, sort of scraggly line, the very tip on the left-hand side going towards 42. You're referring to figure 1, Your Honor? Yes. Can you tell us what that is? Is that just part of this other sort of line that's going through in the diagram? There was no testimony in the record below as to what that line is. But what we do know is that the only cutting edge that's described as extending from the axis are the cutting edges 42 and 52. So that may very well be another cutting edge or some other structure, but the cutting edge that extends from the axis is the cutting edge 42 and 52. And that is clear from the specification, and that's at column 3, lines 13 through 14. And so it's our view that language in column 3, that the cutting edges 42 and 52 extend outwardly from the longitudinal axis in combination with the side view of figure 1, which shows 42 and 52 in this V-shape meeting at element 16, as well as figure 2, which shows a continuous line. And I know these figures are difficult to visualize, so if you kind of think about a pen and you're looking at the pen flat on, the tip would be, and if you were trying to draw that view, the tips would be meeting at the center, but it would be shown on a planar view as simply a straight line. And so that's how this figure is showing that. It's a continuous line, but we're just not seeing the elevation of the tips meeting at the axis 16. The other point that a council made is that somehow the flutes would collapse if the cutting edges met at the axis. Again, no evidence, no testimony that that, in fact, would be the case. We have an implant depicted here with cutting edges meeting at the axis. The claim is covered as cutting edges commencing at the axis. And the other thing I wanted to point out is that the claims only require at least one cutting edge to be commencing at the axis. Okay. What about DOE? Sure. So with regard to DOE, we pointed out in our motion for summary judgment of non-infringement that there were several narrowing amendments made to the claims in response to prior art rejections. So the first amendment was when the claims merely required an implant that was self-drilling and self-tapping. The claims were rejected over CLARDI. In response to that rejection, appellant added, specified that the implant had an axis  and made statements in that amendment, and I think that's Appendix 533 and 534, to say that they were making more clear that the implant as claimed includes a cutting edge which extends radially outwardly. The claim further specifies that the cutting edge extends from the axis. So the rationale for the amendment was to specify the direction and the orientation of the cutting edge. And before the district court, appellants did not argue that this was not a narrowing amendment. They really made no showing that any sort of exception to prosecution history estoppel would apply. On this appeal, they're making an argument that the very rare tangential relation exception should somehow apply here. We just don't think that that's applicable because, again, the purpose for the amendment was to specify direction and orientation of the cutting edge. That is exactly the issue that we're disputing here with regard to the Nobel implant as the direction and orientation of the cutting edge. So we just don't believe that this is tangential. We think it's directly related to the amendment. And we also think that under the case law, including the Felix v. American Honda case, as well as the other cases we cited in our brief, that it was incumbent upon appellant at the district court level to show what the objectively apparent reason was for the amendment. And if you look at the portions of the record below where appellant purports to have demonstrated the applicability of the tangential relation exception, and that's at Joint Appendix 2860 and 2861, all we see is attorney argument. We see citation to the Markman order, but we don't have any explanation of the amendments of the statements at Appendix 533 and 534 that I just went through where appellant clearly indicated that the purpose of the amendment was to make more clear that the implant as claimed includes a cutting edge which extends radially outwardly. So we just don't think that appellant has met its burden to establish any sort of exception to prosecution history estoppel. Can I ask you another question? I can confirm it with Ms. Sullivan I didn't ask before. In statement of related cases, you list the PTAB proceeding. What's the situation with the PTAB proceeding? Yes, so the PTAB denied institution of the IPR. So that's done? That is done, yes. And then, Your Honor, with regard to the second claim limitation, which is the commencing at the axis, you had asked about prosecution history estoppel. We did also make an argument, which the district court also ruled in our favor, that there was prosecution history estoppel for the commencing at the axis limitation. That was added after the examiner still wasn't convinced that extending radially outwardly was enough. There was a second rejection over day, and in response to that rejection, appellant had to add the commencing at the axis limitation. So again, we believe that that's a narrowing amendment. Again, no tangential relation, but rather a direct relation to the equivalent here, which does not commence at the axis. Ms. Sullivan argues that was just a clarifying amendment. What's your response to that? Well, it was clarifying. If it was clarifying, we believe it was narrowing because the day implant had cutting edges, but the examiner still felt that those were extending radially outwardly, and in response to that, the appellant had to specify that the cutting edges were commencing at the axis, so it was further narrowing the claim. So not just the direction, the extending radially outwardly, but further narrowing where that cutting edge actually started. The amendment was in response to a new rejection based on a new reference. Correct. That's correct, Your Honor. Which in and of itself suggests that it's narrow. You said it better than I could, Your Honor, but yes. Okay. Thank you. Thank you. Are there any other questions? Thank you, Your Honors. We'll restore three minutes, everybody. Thank you very much, Your Honor. Four quick points. My friend first pointed you to Column 3, Line 13, the language of extending outwardly from the longitudinal axis to the distal end of the surface of the tip. That gives her no help because that just gives a direction radially outward. It doesn't tell us the starting point. We believe the starting point has to be adjacent to the flute. Second, I know that there's been some concern about what's that pointy tip doing in Figure 1, that structure. That structure is not labeled, it's not numbered, and it's not described in the spec as having a point. If anything, the curve I pointed you to suggests it doesn't, but don't take it from me. Take it from the district court. The one part of the claim construction we won at Markman is at A10 where the district court found that the bottom could even be flat. We had not disclaimed a flat bottom surface. And in finding that, that really suggests that as construed, and there's no dispute of that finding by my friend, as construed, that bottom that looks pointy in Figure 1 could be flat. And that's consistent with the specification which focuses on adjacency to the flute, which is the key to this patent. Third, I want to point out that the prosecution history, Your Honor, even if it's narrowing, Judge Lynn, your law is so clear we think InterVet is the best case cited in our briefs for where you looked at a prosecution history estoppel argument from a narrowing amendment, and you said it wasn't narrowing because the amendment was not made to avoid prior art that contains the accused equivalent. Day and Clardy, we amended around Clardy for radially extending outward. Then we amended around Day saying commencing at the axis. We were amending those to get around prior art with longitudinal cutting edges. Remember, Clardy and Day self-tap, they create the threads and the grooves. They don't self-drill. We were the first patent we're aware of that had self-drilling and self-tapping. So what we distinguished Day and Clardy, if you picture a sort of hacksaw cutting grooves in a longitudinal direction, a cutting edge running up and down vertically, that's what we were distinguishing. Neither Day or Clardy had cutting edges at the bottom, and that's why in the prosecution history we didn't surrender the scope of the accused equivalent. Nobody's disputing Nobel. We say it infringes. You may not have had to make the amendment that you made, but you did. This happens quite often where attorneys give up more than they needed to give up, but you can't back off. You did what you did. Well, we accept that, Your Honor. We think that our radially extending outward was the narrowest way to distinguish longitudinal cutting edges. The world has two kinds of cutting edges. The world we're in, longitudinal or axial, the ones that cut the grooves in the side, or radial or outwardly extending that might be at different levels of taper at the bottom. There's no in-between. We were disclaiming longitudinal, but we weren't, in order to claim, radially extending. And so, Your Honor, we think radial and longitudinal kind of exhaust the universe here. My friend in her brief talks about peripheral. Peripheral doesn't help her. You could have a peripheral longitudinal axis or a peripheral radial blade. So, Your Honor, we were... Day and Clardy, I'm sorry to repeat the bad pun, but they were night and day different, what we were disclaiming, or what we were surrendering, from the way that we're accusing Nobel. Nobel has cutting edges at the bottom. It's self-drilling and self-tapping. Day and Clardy did not. So the legal error on prosecution history, Estoppel, is identical to the one you found in Intervent, and we should have a remand to prove same function, same way, same result under DOE. And thank you, Your Honor. Thank you. We thank both sides. And that case is submitted.